IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PAUL PETERS, | ) | CIVIL NO. 11-00331 SOM/KSC |
| | ) | |
| Plaintiff, | ) | AMENDED ORDER GRANTING IN |
| | ) | PART, DENYING IN PART, AND |
| vs. | ) | CONTINUING IN PART MOTIONS |
| | ) | FOR SUMMARY JUDGMENT AND |
| ROBERTS MARKEL, PC; | ) | MOTIONS TO DISMISS OR |
| BENTWATER YACHT AND COUNTRY | ) | TRANSFER VENUE |
| CLUB, LTD.; | ) | |
| BRADY ORTEGO; | ) | |
| and DOES I THROUGH X, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**AMENDED ORDER GRANTING IN PART, DENYING IN PART, AND
CONTINUING IN PART MOTIONS FOR SUMMARY JUDGMENT
AND MOTIONS TO DISMISS OR TRANSFER VENUE**

I.        INTRODUCTION.

        The case in which a mountain is likeliest to be made

out of a molehill is a case brought by a plaintiff who is a

lawyer representing himself and whose primary practice area is

not litigation.  This is such a case.

        Plaintiff Paul Peters is a Utah lawyer who now runs a

bed and breakfast business on Maui.  He is the sole plaintiff in

this case, which concerns a Texas country club's dues.  His

Complaint alleged, among other things, theft and violations of

the Racketeer Influenced and Corrupt Organizations Act ("RICO").

The RICO claims asserted in the Third Claim for Relief have been

dismissed with leave to amend if this action is transferred to

Texas.  Reviewing the claims asserted in this case, this court

cannot help but think of another case brought by a pro se

attorney: <u>Walter v. Drayson</u>, 496 F. Supp. 2d 1162 (D. Haw. 2007), <u>aff'd</u> 538 F.3d 1244 (9th Cir. 2008).  The plaintiff-attorney in that earlier case, having made a protracted and expensive civil RICO lawsuit out of what was actually a relatively simple trust and estate dispute, recovered nothing and ultimately was taxed with $5,000 in his opponents' costs.

        The case now before this court begins with the purchase of property in a Texas development.  Peters purchased property in that project in 2002, and his wife, Angela, purchased a separate property in the same project in 2004.  Peters complains that he was double-billed by the Bentwater Yacht and Country Club for membership dues relating to those properties.  Peters takes the position that his family should pay for only one membership, while Bentwater Yacht and Country Club contends that the association documents encumbering both properties require at least a social membership to be maintained for each property. For years, Defendant Bentwater Yacht and Country Club attempted to collect the social dues Angela did not pay on her property. Peters proceeds here alone, without Angela, against Bentwater Yacht and Country Club, the Texas Law Firm of Roberts Markel retained by the club, and Brady Ortego, an attorney at the law firm.

        Like the attorney in <u>Walter v. Drayson</u>, Peters demonstrates that he is smart, imaginative, and resourceful.  But

he is apparently not an experienced litigator, and his zeal and unfamiliarity with court rules have robbed his lawsuit of any sense of proportionality with the actual underlying dispute.

The Complaint's First and Fourth Claims for Relief involve alleged violations of the Fair Debt Collection Practices Act ("FDCPA").  Except with respect to a single letter dated May 12, 2011, from the law firm, summary judgment is granted in favor of all Defendants on the FDCPA claims asserted in the First and Fourth Claims for Relief.  To the extent FDCPA claims are asserted against Bentwater Yacht and Country Club, the FDCPA is inapplicable because the club's attempts to collect its own debt do not render it a debt collector.  Even if Bentwater Yacht and Country Club were a debt collector, its debt collection activities, like those of Ortego and most of the collection activities of the law firm, were aimed at only Angela, not Peters.  Peters lacks statutory standing to maintain claims on behalf of his wife, who is not a party to this action.  In granting summary judgment on most of Peters's FDCPA claims, the court is not ruling on whether such claims could be brought by Angela.  The court is only ruling that the FDCPA does not allow a husband to assert claims belonging to his wife.

To the extent the motions seek other relief, including the transfer of venue to the United States District Court for the Southern District of Texas, Houston Division, the court continues

the hearing until 11:15 a.m. on August 27, 2012, and requests supplemental briefing and/or motions to aid the court in determining whether a transfer of venue or other relief is appropriate.

II.      BACKGROUND.

Paul H. Peters is a Utah attorney who now apparently runs a bed and breakfast on Maui. See ECF 31-6 (letter dated August 30, 2011, from Utah State Bar indicating that Peters is an active member of the Utah Bar and is in good standing); ECF 95-9 (review of the Blue Tile Beach House on Maui).

In February 2002, Peters purchased property in the Bentwater development in Texas from Mark G. Sweeney.  This property is described as "Lot Five (5), Block One (1) of BENTWATER, SECTION EIGHTEEN (18), a subdivision situated in the James J. Foster Survey, A-203, Montgomery County, Texas."  See ECF 31-8 (warranty deed).  According to the Declarations of Covenants, Conditions and Restrictions for Bentwater Section 18, filed in April 1990 as Clerks File # 9014194, Section 6.02(f) at page 26:  "Each owner of a Lot, other than Declarant, has agreed to obtain and maintain a 'Social Membership' as defined in the By-Laws of the Bentwater Country Club, Inc., a Texas corporation ('BCC') during the term of said Owner's ownership of a Lot."  See ECF No. 31-11.

Peters, unmarried at the time he bought the first lot in 2002, married Angela in 2004.  Declaration of Paul Peters ¶ 3 (Jan 26, 2012), ECF No. 83 (filed Jan. 31, 2012).

After they got married, Angela purchased a lot in the Bentwater development in her name, identified as "SURFACE ESTATE ONLY OF LOT EIGHT (8) IN BLOCK ONE (1) OF BENTWATER SECTION THIRTY-NINE (39), A SUBDIVISION IN MONTGOMERY COUNTY TEXAS."  See ECF No. 31-9 (General Warranty Deed with Vendor's Lien).  The mailing address for this property was 254 Creekwood West, Montgomery, TX  77356.  Id.  The title to this property, purchased from Andrew and Harriet Stromdahl, is held by "Angela M. Peters, a married woman, married to Paul H. Peters (whether one or more, hereinafter called 'Grantee')."  Id.  It appears that Angela took out a loan to purchase this property.  See ECF No. 83-3 (Deed of Trust).  The "Borrower" is identified in the loan documents as "ANGELA M. PETERS, joined herein Pro Forma by his/her spouse."  Id.  Peters signed the loan document on behalf of Angela under a power of attorney and signed it himself as a "Borrower."  Id.  Although title to the property is held in Angela's name, various real property tax documents list both Peters and Angela as owners.  See ECF No. 83-4, 83-5, and 83-6.

There is no dispute that Peters and Angela were not living in Hawaii at the time Angela purchased her lot in 2004.  See, e.g., ECF No. 83-7 (Dec. 3, 2004, letter sent to the Peters

in Montgomery, Texas); ECF No. 31-21 (July 15, 2005, letter sent to the Peters in Key West, Florida); Sealed Ex. B (Feb. 27, 2012) (2002-04 tax returns for Paul Peters, indicating that his home address was in Key West, Florida; 2005-09 tax returns for Paul Peters, indicating that his home address was in Montgomery, Texas). Although Peters's tax returns listed his home address between 2005 and 2009 as Montgomery, Texas, it appears that Peters and/or Angela may have started living in Hawaii at some point in 2005. See ECF No. 83-11, PageID #1231 (Nov. 2005 bill addressed by Bentwater Yacht and Country Club to Angela in Paia, Hawaii); see also ECF No. 83-11, PageID #1176 (Jan. 2006 bill addressed by Bentwater Yacht and Country Club to Peters in Paia, Hawaii).

Peters asserts that Bentwater Yacht and Country Club recognized in December 2004 that he and his wife jointly owned the second property, as evidenced by a letter from Trina Almas, the club's membership director, addressed to Peters and Angela, stating, "congratulations on your purchase." See ECF No. 31-15. This document, however, only discussed membership and did not clearly indicate who was the record owner of the property. See id. Enclosed with the letter were applications for membership and for credit. Id.

The second lot was encumbered by Declarations of Covenants, Conditions and Restrictions for Bentwater Section 39,

filed in April 1994 as Clerks File # 9420835, that were similar to the provisions governing the first lot.  Section 6.02(g) at page 29 of that document states: "Each owner of a Lot, other than Declarant, has agreed to obtain and maintain a 'Social Membership' as defined in the By-Laws of the Bentwater Country Club, Inc., a Texas corporation ('BCC') during the term of said Owner's ownership of a Lot."  See ECF 31-12.

On or about May 4, 2005, Trina Almas, Bentwater's membership director, sent Peters and Angela a letter stating, "Looking through your file I see that we still have not received your application for membership and application for credit. Enclosed is another set of applications for you."  See ECF No. 34-10.

On August 31, 2005, various Declarations of Covenants, Conditions and Restrictions for Bentwater, including those applicable to the first and second lots in issue here, were amended to state: "Notwithstanding anything contained in the Declarations to the contrary, a Social Membership, as previously defined, shall be required to be maintained on each and every Lot, and the Owner of multiple Lots shall be obliged to maintain a Social Membership on each and every Lot owned."  See ECF 31-13 (Second Amendment to Clarify the Declarations of Covenants, Conditions and Restrictions for Bentwater).

The Complaint in this case alleges that, when the second lot was purchased, someone from the Bentwater Yacht and Country Club told Peters that it "would not duplicate membership dues." See Complaint ¶ 25, ECF No. 1 (May 24, 2011).  The Complaint alleges that, for a period, duplicate membership dues were not charged.  That is, Peters and Angela were allegedly not charged dues on both lots.  Id.  However, the Complaint says that "recently," duplicate dues have been charged.  Id. ¶ 26.

The earliest bill sent by Bentwater Yacht and Country Club to "Angela Peters" that is in the record is dated November 30, 2005.  The November 2005 bill indicates that Angela owed Bentwater $970.28.  The bill indicates that her previous balance was $882.62.  See ECF No. 83-11, PageID # 1231 (Bates Stamp 00626).  It is not clear whether earlier bills were sent to Angela, as the Bates Stamp numbers on the documents before this court jump from 00614 to 00626, and the exhibit does not provide all of those intervening pages.  The $882.62 owed is consistent with all of the social fees and late fees allegedly owed by Angela from December 2004 through October 2005.  See ECF No. 34-16.  It appears that, beginning in May 2011, Angela began making some payments, bringing her account current through September 2007.  See ECF No. 34-16; ECF No. 83-12 PageID #1297 (Bates Stamp No. 00692).  There is no dispute that the bills sent by Bentwater

Yacht and Country Club concerning the second property were all
sent to "Angela Peters."  <u>See</u> ECF Nos. 83-11 and 83-12.

For a while, membership dues on the first lot,
purchased by Peters in 2002, were paid by way of automatic debit
from Peters's Bank of America checking account in Key West,
Florida, pursuant to Peters's authorization of February 10, 2005,
to "Bentwater Yacht & Country Club."  <u>See</u> ECF No. 95-8.  It
appears that Peters stopped paying dues on the first lot in April
2011, shortly before filing the Complaint in this matter.  <u>See</u>
ECF No. 83-11, PageID #s 1176 through 1230.

On March 2, 2010, "Bentwater Yacht & Country Club,
LTD.," through its "Senior A/R Accountant," Toni Steck, sent
Angela a letter.  <u>See</u> ECF No. 31-30.  This letter indicated that
Angela owed more than $8,000.  It told Angela, "Your membership
privileges for this account have been suspended as well as any
other Bentwater account.  During the period of suspension, you
and your family shall have no right or privileges to use the
facilities."  <u>Id.</u> (emphasis deleted).   The letter indicated
that Angela's name had been posted on the "Club's delinquent
list."  <u>Id.</u>  This letter is nearly identical to one that had been
sent in March 2005 to Angela by "Bentwater Yacht & Country Club,
LTD."  <u>See</u> ECF No. 34-8.

Bentwater Yacht and Country Club continued to deduct
membership dues from the Bank of America checking account for

dues relating to the first lot after it sent the March 2010 letter barring Angela and her family from the club's facilities. Peters's Complaint asserts that, in so doing, Bentwater stole membership dues of $329.38 per month.  <u>See</u> Complaint ¶¶ 28, 29, 34, 56-58.  The bills submitted by Peters indicate that he stopped the automatic deductions more than a year after his wife was told that her family would not be able to use the facilities. <u>See</u> ECF No. 83-11, PageID #1223 (May 2011 bill).

On or about March 27, 2010, Peters and Angela sent Toni Steck a letter responding to the March 2, 2010, letter.  <u>See</u> ECF No. 31-31.  The response asked Steck to explain the nature of the alleged debt, to provide an accounting of how the debt had been determined, to provide the documentation forming the basis of the alleged debt, to provide the basis for denying the entire family use of the Bentwater facilities, to provide copies of prior invoices, and to provide the name and address of the original creditor.  <u>See</u> <u>id.</u>

On or about April 8, 2010, Defendant Brady E. Ortego, an attorney at the Defendant law firm in this action, Roberts Markel, responded to the letter from Peters and Angela of March 27, 2010.  <u>See</u> ECF No. 31-32.  Ortego sent that response to Peters's Hawaii address.  <u>See</u> ECF No. 31-32.  The response indicated that Ortego and the law firm represented "Bentwater Yacht & Country Club, LTD," the entity that was allegedly owed

the dues.  Id.  Ortego's letter attached an itemized accounting
of all of the fees Angela Peters owed and explained that the fees
were based on the Declarations of Covenants, Conditions and
Restrictions for the property, as amended, which required "social
memberships" to be maintained for all properties, even when
multiple properties were owned by the same person.  See id.  The
letter stated: "We are attempting to collect a debt and all
information obtained will be used for that purpose."  Id.
(emphasis deleted).

     On or about June 25, 2010, Bentwater Property Owners
Association, Inc., through its attorney, Ortego, filed a "Notice
of Assessment" that placed a lien on Angela's property in
Montgomery, Texas.  See ECF No. 31-33.  This lien indicated that
the owner of the property on which it was being placed was
"Angela M. Peters."  Id.  On or about June 28, 2010, Ortego sent
Angela a copy of the Notice of Assessment lien on Roberts Markel
stationery.  See ECF No. 83-25.  The letter was sent by certified
and regular mail.  Id.

     On or about November 9, 2010, Peters and Angela sent
Ortego an email, stating, "We are seeking your assistance to
resolve a critical situation involving our family's finances and
reputation."  See ECF No. 83-26, PageID #1539.  The email stated
that, in the process of refinancing the mortgage on Angela's
property, "we learned that you recorded a lien with the

11

Montgomery County Clerk against our home." Id. The email

thereby suggested that Peters and Angela had not seen the June

2010 letter notifying Angela of the lien. In their email, Peters

and Angela complained about alleged double billing and noted that

$329.38 was being taken out of their checking account without

their consent, while they were being denied use of club

facilities. Id. PageID #1540-41.

On or about November 22, 2010, Ortego replied via email

to the email of November 9, 2010, stating: "When you purchased

your homes in Bentwater, you agreed to pay certain charges

related to your ownership of the property . . . . You are

delinquent in your payment of the charges related to your social

membership or the country club charge." See ECF 83-26, PageID

#1537. Ortego noted, "The $329.38 that you are paying each month

relates to only one membership for one lot. There is a remaining

balance owed for the other lot you own which is the basis of the

collection action." Id. Documents submitted to this court

confirm that, as of November 2010, Peters was paying the monthly

dues on his property. See ECF No. 83-11, PageID #1217. Ortego

informed Peters and Angela in the email of November 22, 2010,

that, when they purchased lots in Bentwater, they had agreed that

social membership dues "'shall be a charge on the Lots and shall

be a continuing lien upon the property . . . .'" ECF No. 83-

11, PageID #1217 (quoting Article VI, Section 6.01 of the

12

declaration relating to Angela's property).  Ortego noted that, "While the social membership dues are assessed by the BYCC [Bentwater Yacht and Country Club, LTD], the POA [Bentwater Property Owners Association, Inc.] is assigned to collect the delinquent charges from non-paying owners."  ECF No. 83-26 at PageID #1537.

On or about May 12, 2011, Marc Markel, on behalf of the law firm of Roberts Markel, sent Peters and Angela a Final Demand Letter.  See ECF No. 83-27.  This letter noted that the law firm had been retained by the Bentwater Property Owners Association, Inc., to collect delinquent assessments regarding 254 Creekwood West, Angela's property.  Id.  The letter stated that the law firm represented the association "as a creditor in this matter" and noted that it was "attempting to collect a debt" and that "all information obtained will be used for that purpose."  Id.  The letter said, "You have previously been sent correspondence with regard to delinquent assessments" and noted that the balance due on the account was $11,535.98.

III.     ANALYSIS.

     A.   FDCPA Claims.

         1.   **Peters Lacks Statutory Standing to Assert Most of the FDCPA Claims.**

In the Complaint's First and Fourth Claims for Relief, Peters asserts that Defendants have violated the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e, 1692f, and 1692g.

Defendants have moved to dismiss the FDCPA claims, arguing that Angela, not Peters, was the subject of the debt collection activities.  Defendants contend that Peters lacks "standing" to assert FDCPA claims based on debt collection activities concerning Angela.  Although Defendants cite Rule 12(b)(1) of the Federal Rules of Civil Procedure, which concerns a motion to dismiss for lack of subject matter jurisdiction, this court concludes that Defendants' motions actually challenge Peters's statutory standing, rather than this court's subject matter jurisdiction.

Congress enacts statutes that create legal rights. When such legal rights are infringed on, a person may have an injury for purposes of Article III standing, even though there would be no injury without the statute.  See Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973).  A statute may place additional restrictions on who can sue, creating "statutory standing" requirements that are separate from the standing requirements relating to a court's subject-matter jurisdiction.

14

See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 90-92 (1998).

Here, the court clearly has subject matter jurisdiction, as FDCPA violations are alleged. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). In addition, the court appears to have diversity jurisdiction. For purposes of subject matter jurisdiction, whether the claims are valid or not is irrelevant. Defendants are not denying that Peters alleges numerous injuries (e.g., loss of use of club facilities). Instead, they are arguing that Peters does not meet the statutory requirements for asserting an FDCPA claim. The Ninth Circuit has noted that, when a court determines whether a plaintiff is an aggrieved person under a statute, that determination "is a merits determination, not a threshhold [jurisdictional] standing question." Jewel v. Nat'l Security Agency, 673 F.3d 902, 907 n.4 (9th Cir. 2011).

In addition to citing the subject matter jurisdiction provision in Rule 12(b)(1), Defendants also rely on Rule 12(b)(6), which concerns motions to dismiss for failure to state a claim. However, instead of treating the present motions as motions to dismiss, this court treats the motions as seeking summary judgment under Rule 56 of the Federal Rules of Civil Procedure. After providing the parties with notice of the

15

court's intention to convert the motions into summary judgment motions and after allowing the parties to be heard on the matter, the court concluded that conversion was appropriate given all parties' submission of evidence outside the pleadings in connection with the motions.  See Inclinations at 2, ECF No. 117, May 7, 2012.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2010).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

16

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial.  T.W. Elec. Serv., Inc., 809 F.2d at 630.  At least some "'significant probative evidence tending to support the complaint'" must be produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv.

Co., 391 U.S. 253, 290 (1968)); see also Addisu, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.").   "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).   Accord Addisu, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party.   T.W. Elec. Serv., Inc., 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party.   Id.   When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."   Id.

The FDCPA provides damages to "any person" who suffers "actual damage" at the hands of a "debt collector:"

18

> Except as otherwise provided by this section,
> any debt collector who fails to comply with
> any provision of this subchapter with respect
> to any person is liable to such person in an
> amount equal to the sum of--
>
> (1) any actual damage sustained by such
> person as a result of such failure; [or]
>
> (2)(A) in the case of any action by an
> individual, such additional damages as the
> court may allow, but not exceeding $1,000[.]

15 U.S.C. § 1692k(a).  The court examines each of Peters's FDCPA

claims to see whether he may maintain it.

Peters's Complaint generically asserts that Defendants

violated the FDCPA by filing a lien, by misrepresenting the

character, status, and amount of the debt, by failing to validate

the debt, and by making false statements.  Peters's Complaint

does not tie specific wrongful conduct to any section of the

FDCPA.  Accordingly, the court asked Peters at the hearing to

identify the legal and factual bases for his FDCPA claims.

Peters clarified that he was asserting violations of 15 U.S.C.

§§ 1692d,[1] e,[2] f,[3] and g[4] based on six letters.  Except with

---

[1]At the hearing on the present motions, Peters referred to
FDCPA sections by Act number, rather than by the section numbers
in the United States Code.  Following the hearing, to address the
court's reference to local court rules and to comply with Local
Rule 7.6, Peters submitted corresponding statutory citations
to the United States Code.  Contributing to the already voluminous
filings, Defendants filed "objections" to this submission.  ECF
Nos. 122, 123.  The court overrules the objections, which in no
way reflect that any Defendant was prejudiced in any manner by
Peters's eventual compliance with this court's rule requiring
that any statutory citation include the United States Code
provision.

respect to the May 12, 2011, letter from the law firm of Roberts

Markel to "Angela M. Peters and Paul H. Peters," Peters fails to

demonstrate that there were possible FDCPA violations in the form

of debt collection activities directed to Peters himself.  In

---

With respect to Peters's reference to § 1692d(3), the court
notes that that statute prohibits a "debt collector" from
"engaging in any conduct the natural consequence of which is to
harass, oppress, or abuse any person in connection with the
collection of a debt," including the "publication of a list of
consumers who allegedly refuse to pay debts."

[2]In relevant part, § 1692e prohibits a "debt collector" from
using "any false, deceptive, or misleading representation or
means in connection with the collection of any debt."  It
explains that the following are violations of § 1692e: "(2) The
false representation of (A) the character, amount, or legal
status of any debt . . . .  (5) The threat to take any action
that cannot legally be taken. . . .  (10) The use of any false
representation or deceptive means to collect or attempt to
collect any debt or to obtain information concerning a consumer."

[3]In relevant part, § 1692f prohibits a "debt collector" from
using "unfair or unconscionable means to collect or attempt to
collect any debt," including "(1) The collection of any amount
(including any interest, fee, charge, or expense incidental to
the principal obligation) unless such amount is expressly
authorized by the agreement creating the debt or permitted by
law. . . . (6) Taking or threatening to take any nonjudicial
action to effect dispossession or disablement or property if--. .
. (C) the property is exempt by law from such dispossession or
disablement."

[4]In relevant part, § 1692g requires a "debt collector" to
take certain actions within five days of an initial communication
with a consumer in connection with the collection of a debt.
These actions include sending a written notice containing the
amount of the debt, the name of the creditor to whom the debt is
owed, statements concerning verification of a debt, and provision
of the name and address of the original creditor, if different
from the current creditor.  15 U.S.C. § 1692g(a).  The section
also requires the debt collector to cease collection activities
if notified in writing that the alleged debt is disputed.  15
U.S.C. § 1692g(b).

fact, the court is at somewhat of a loss as to why Peters, a Utah attorney, is attempting to pursue claims that really belong to his wife.  Perhaps Peters pursues these claims <u>pro se</u> because he is not licensed to practice law in Hawaii and therefore cannot represent his wife.  Angela may be reluctant to represent herself or to incur the cost of retaining an attorney, even if only to satisfy the local attorney requirement if Peters were admitted <u>pro hac vice</u> for the purpose of representing her.  Whatever his motivation, Peters lacks statutory standing to pursue most of the FDCPA claims.

> **a.    Bentwater Yacht and Country Club is Not Liable For Any of the Alleged Violations of the FDCPA.**

At the hearing on the present motions, Peters stated that his FDCPA claims are based in part on letters that Bentwater Yacht and Country Club sent him and Angela in December 2004 and May 2005.  The December 2004 letter stated, "[C]ongratulations on your purchase of a Bentwater property.  Enclosed is an application for membership and an application for credit."  <u>See</u> ECF No. 83-7.  The May 2005 letter stated, "Looking through your file I see that we still have not received your application for membership and application for credit.  Enclosed is another set of applications for you."  <u>See</u> ECF No. 34-10.  Because these letters are by Bentwater Yacht and Country Club, the court construes Peters's FDCPA claims, to the extent based on these

letters, as asserted against only Bentwater Yacht and Country Club and not against other Defendants.[5]  Notably, neither letter even refers to any debt, much less seeks to collect any debt.  In short, they cannot be read as having involved debt collection activity by a "debt collector."  Certainly, as neither letter suggests that Peters himself owed any debt, Peters may not base any of his FDCPA claims on either letter.  Peters identifies no section of the FDCPA that was violated by the congratulatory letter with which applications for membership and for credit were provided, or by the subsequent letter noting that completed applications had not yet been received.  Summary judgment is therefore granted in favor of Bentwater Yacht and Country Club on any FDCPA claim arising out of these two letters.

Even if the letters could be read as attempts to collect a debt, Bentwater Yacht and Country Club could not be liable for any possible FDCPA violation based on the December 2004 and May 2005 letters, because Bentwater Yacht and Country Club could not possibly qualify as a "debt collector" with respect to those letters.  Any debt in issue would have been

---

[5]If Peters intended these particular letters to support claims against other Defendants, the court grants summary judgment to those other Defendants, as there is no evidence tying them to these matters.  The court takes the same position with respect to other claims it reads as limited to fewer than all Defendants.  That is, to the extent Peters asserts such claims against all Defendants, they are all entitled to summary judgment in the absence of evidence tying them to those claims.

Bentwater's own debt, not a debt it was seeking to collect for

another person or entity.  The FDCPA defines "debt collector" as

follows:

> any person who uses any instrumentality of
> interstate commerce or the mails in any
> business the principal purpose of which is
> the collection of debts, or who regularly
> collects or attempts to collect, directly or
> indirectly, debts owed or due or asserted to
> be owed or due another.

See 15 U.S.C.A. § 1692a(6).  A "debt collector" does not include

"any person collecting or attempting to collect any debt owed or

due or asserted to be owed or due another to the extent such

activity . . . (ii) concerns a debt which was originated with

such person."  15 U.S.C. § 1692a(6)(F)(ii); see also De Dios v.

Int'l Realty & Invs., 641 F.3d 1071, 1074 (9th Cir. 2011) (noting

that the FDCPA excludes from the definition of "debt collector"

any "person who originated the debt, such as a creditor to whom

the debt was originally owed"); Rowe v. Educ. Credit Mgm't Corp.,

559 F.3d 1028, 1031 (9th Cir. 2009) (stating that "a 'creditor'

is not a 'debt collector' under the FDCPA"); Jonak v. John

Hancock Mut. Life Ins. Co., 629 F. Supp. 90, 94 (D. Neb. 1985)

(noting that the definition of "debt collector" "excludes both

creditors seeking to collect their own debts and the officers and

employees of creditors collecting debts for the creditors").

Not only is Bentwater Yacht and Country Club free of

FDCPA liability with respect to the bills it sent Angela for

social club dues and late fees, see ECF No. 83-11 and 83-12,
Bentwater Yacht and Country Club has no FDCPA liability with
respect to any of the other letters attempting to collect its own
debt.  For example, on March 2, 2010, Bentwater Yacht & Country
Club, LTD, through its "Senior A/R Accountant," Toni Steck, sent
"Angela Peters" a letter that attempted to collect allegedly past
due amounts owed to Bentwater.  This letter notifies Angela that
she and her family "shall have no right or privileges to use the
facilities" and that Angela's name has been "posted on the Club's
delinquent list."  See ECF No. 31-30.  Because Peters relies on
FDCPA provisions applicable to debt collectors, and because
Bentwater Yacht and Country Club does not fit into the definition
of "debt collector" in seeking to collect amounts owed to it,
Bentwater Yacht and Country Club cannot be liable to Peters on
his FDCPA claims.

Peters points to documents that refer to different
Bentwater entities, arguing that it is unclear that Bentwater
Yacht and Country Club was itself owed anything.  Thus, for
instance, Peters points to the Declarations encumbering the
properties and requiring "social club" memberships "as defined in
the By-Laws of the Bentwater Country Club, Inc."  See, e.g., ECF
Nos. 31-11 and 31-12.  But that does not raise a genuine issue of
material fact as to whether Bentwater Yacht and Country Club was
attempting to collect its own debt.  Instead, the reference to

24

Bentwater Country Club, Inc., addresses the definition of a "social club" membership; it does not identify the entity to which membership dues are owed.

Peters attempts to raise a genuine issue of fact as to whether Bentwater was attempting to collect its own debt by showing that the entity seeking to collect the debts used different names. Compare ECF Nos. 83-11 and 83-12 (bills from "Bentwater Yacht and Country Club"), with ECF Nos. 31-30 (collection letter from Toni Steck on behalf of "Bentwater Yacht & Country Club, LTD"); 31-32 (letter from Ortego saying he was representing "Bentwater Yacht & Country Club, LTD"); 31-33 (notice of assessment on behalf of "Bentwater Property Owners Association, Inc."); 83-26 (email from Ortego indicating that he represented "Bentwater Yacht and Country Club, LTD," which assessed membership dues, and "Bentwater Property Owners Association, Inc.," which was assigned to collect delinquent charges); 83-27 (letter from law firm indicating that it represented "Bentwater Property Owners Association, Inc."). Even if Bentwater Yacht and Country Club could be considered a "debt collector" because it was not collecting its own debts, Peters would lack "statutory standing" to assert the FDCPA claims to the extent collection activities were directed only toward Angela.[6]

_____

[6]The record does not allow the court to conclude that, because Bentwater Yacht and Country Club is related to other Bentwater entities, the club is not a "debt collector" for FDCPA

See generally Burdett v. Harrah's Kansas Casino Corp., 294 F. Supp. 2d 1215, 1227 (D. Kan. 2003); Dewey v. Assoc. Collectors, Inc., 927 F. Supp. 1172, 1174 (W.D. Wis. 1996).  No matter what, relief under the FDCPA is available only to a person who sustains damage through a debt collector's violation of the FDCPA "with respect to" that very person.  15 U.S.C. § 1692k(a).  When a debt collector violates the FDCPA with respect to someone else, the FDCPA does not provide for claims by others.

The court also denies Peters's Rule 56(d) request. Rule 56(d), formerly Rule 56(f), permits a court to continue a summary judgment motion when a "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  The 2010 Advisory Committee Notes state, "Subdivision (d) carries forward without substantial change the provisions of former subdivision (f)." That is, a party requesting a Rule 56(d) continuance bears the burden of (1) filing a timely application that specifically identifies relevant information; (2) demonstrating that there is

---

purposes to the extent it is collecting a related entity's debt. See 15 U.S.C. § 1692a(6)(B) ("debt collector" does not include "any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts").  As the Ninth Circuit noted in Fox v. Citicorp Credit Services, Inc., 15 F.3d 1507, 1514 (9th Cir. 1994), the "related entity" exemption requires proof of certain circumstances, none of which the court has any evidence of.

some basis to believe that the information sought exists; and (3) establishing that such information is essential to resist the summary judgment motion.  See Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1130 (9th Cir. 2004) (interpreting Rule 56(f)) (citation omitted); accord Moss v. U.S. Secret Serv., 572 F.3d 962, 966 n.3 (9th Cir. 2009) ("Rule 56(f) requires a party seeking postponement of a summary judgment motion to show how additional discovery would preclude summary judgment and why it cannot immediately provide specific facts demonstrating a genuine issue of material fact." (punctuation, quotations, and citation omitted)).  Peters says that he needs a continuation of the motions to allow him to conduct discovery regarding whether Bentwater Yacht and Country Club was collecting its own debt.  However, because Bentwater Yacht and Country Club's letters and bills were directed only to Angela, the sole owner of the second lot, Peters's proposed discovery would have no impact on this portion of the motions.

> **b.   The June 21, 2006, Letter Was Not an Attempt to Collect a Debt That Gives Rise To FDCPA Liability on The Part of Roberts Markel.**

At the hearing on the present motions, Peters stated that his FDCPA claims were also based in part on a letter dated June 21, 2006.  Peters appears to have been referring to a letter by Marc D. Markel to Peters and Angela on Roberts Markel stationery.  See ECF No. 83-22.  The letter noted that Markel

27

represented the Bentwater Property Owners Association and informed Peters and Angela that no subassociation had been incorporated, meaning that the association itself was vested to charge, collect, and disburse "Harbor View" charges.  Id. Roberts Markel is the only named Defendant with any connection to this letter.  Accordingly, the court construes Peters's claim arising out of this letter as limited to Defendant Roberts Markel.

As with the 2004 and 2005 letters identified by Peters at the hearing, the letter of June 21, 2006, is not an attempt to collect a debt.  The letter provides information but does not demand payment or mention any action resulting from nonpayment. Peters does not state which section of the FDCPA it could possibly violate.  In fact, it is not at all clear which claim asserted in the Complaint this letter is relevant to.  Given the absence of genuine issues of material fact relating to this letter, the court grants summary judgment to the law firm of Roberts Markel to the extent an FDCPA claim is being asserted against it based on the letter of June 21, 2006.

        **c.**   **The April 8, 2010, Letter Was Not an Attempt to Collect a Debt From Peters.**

Peters also identified a letter of April 8, 2010, as forming the basis of at least part of an FDCPA claim.  Defendant Brady E. Ortego, an attorney at Roberts Markel, wrote a letter to Peters and Angela dated April 8, 2010.  The court therefore

construes any FDCPA claim based on the letter of April 8, 2010, as asserted against Ortego and Roberts Markel.

That letter responded to a letter from Peters and Angela dated March 27, 2010.  See ECF No. 31-32.  The response indicated that Ortego and the law firm represented "Bentwater Yacht & Country Club, LTD," the entity allegedly owed the dues. Id.  The letter attached an itemized accounting of all of the fees Angela owed and explained that the fees were based on the Declarations of Covenants, Conditions and Restrictions for the property, as amended, which required "social memberships" to be maintained for all properties, even when multiple properties were owned by the same person.  See id.  The letter stated: "We are attempting to collect a debt and all information obtained will be used for that purpose."  Id. (emphasis deleted).  Although this letter was addressed to both Peters and Angela, the attached itemization makes it clear to any reasonable person that the letter was referring to a debt that the writer of the letter considered to be owed only by Angela, not Peters.  Peters was included as an addressee of the letter only because he and Angela had earlier sent Ortego a letter.  See ECF No. 31-31 (March 27, 2010, letter asking Bentwater to explain the nature of the alleged debt, to provide an accounting of how the debt was determined, to provide the documentation forming the basis of the alleged debt, to provide the basis for denying the entire family

29

use of the Bentwater facilities, to provide copies of prior invoices, and to provide the name and address of the original creditor).

Because there is no genuine issue of material fact as to whether Ortego and/or the law firm were attempting to collect a debt from Peters when Ortego sent the letter of April 8, 2010, summary judgment is granted in favor of Ortego and Roberts Markel to the extent an FDCPA claim is asserted against them based on the letter of April 8, 2010.

> ### d. The November 22, 2010, Email Was Not an Attempt to Collect a Debt From Peters.

Peters stated at the hearing that he was also basing his FDCPA claims on an email of November 22, 2010, from Ortego. No reasonable juror could find that that email was attempting to collect a debt from Peters.  The email was clearly responding to an email dated November 9, 2010, from Peters and Angela, and the response was directed to both of them only because they appeared to have both sent the original communication.  Their email of November 9, 2010, had asked Ortego to help them "resolve a critical situation" and complained about the alleged double billing.  See ECF No. 83-26, PageID #1539.

Ortego's responsive email dated November 22, 2010, stated: "When you purchased your homes in Bentwater, you agreed to pay certain charges related to your ownership of the property . . . .  You are delinquent in your payment of the charges

30

related to your social membership or the country club charge."
See ECF 83-26, PageID #1537.  Ortego noted that, "The $329.38
that you are paying each month relates to only one membership for
one lot.  There is a remaining balance owed for the other lot you
own which is the basis of the collection action."  Id.  Ortego
further stated that, when Peters and Angela purchased their lots
in Bentwater, they agreed that social membership dues "'shall be
a charge on the Lots and shall be a continuing lien upon the
property . . . .'"  ECF No. 83-11, PageID #1217 (quoting
Article VI, Section 6.01 of the declaration relating to Angela's
property).

        Ortego's email of November 22, 2010, responded to an
email by Peters and Angela, recognized that more than one lot had
been purchased, and discussed the bases for charging a social
membership for each property.  Given that context, no reasonable
juror would conclude that Ortego was attempting to collect from
Peters the allegedly delinquent social dues and late fees for
Angela's property.  Peters fails to show that the email of
November 22, 2010, violated any FDCPA provision.  Accordingly,
summary judgment is granted in favor of Ortego and Roberts Markel
on the FDCPA claim arising out of the email of November 22, 2010.

   e.   **Peters May Not Assert an FDCPA Claim Arising Out of the Lien on Angela's Property.**

Peters also lacks statutory standing to assert FDCPA claims based on the June 2010 lien that was placed on Angela's property.  Any collection effort relating to the lien was directed at Angela, the owner of the property, not Peters.  In fact, the lien specifically identifies the owner of the applicable property as Angela M. Peters and does not mention Peters at all.  See ECF No. 31-33.  Nor does Peters have statutory standing to assert FDCPA violations based on the June 28, 2010, letter in which Ortego sent Angela a copy of the Notice of Assessment lien on Roberts Markel stationery, as  no collection activities were directed at Peters in that letter.  See ECF No. 83-25.  In fact, Peters earlier suggested that he had not seen the letter of June 28, 2010.  See ECF No. 83-26 (November 9, 2010, email from Peters and Angela to Ortego stating, "In the process of refinancing our current mortgage for our home at 254 Creakwood . . . , we learned that you recorded a lien with the Montgomery County Clerk against our home.").

In ruling that Peters lacks statutory standing to assert FDCPA claims arising out of a lien placed on Angela's property, the court recognizes that various tax records list both Peters and Angela as owners of the second Bentwater property.  The court also recognizes that Peters signed a loan document as a

32

"Borrower" as an accommodation.  These documents do not create a genuine issue of fact as to the identity of the owner of the second property.  The only recorded document presented to the court indicates that the property is held in the name of Angela alone.  If recordation and the Statute of Frauds, Vernon's Tex. Stat. & Codes Ann. § 26.01, are to have any meaning or effect, the court must treat the recorded document as denoting ownership.

Even if tax authorities considered Peters an owner of the property, there is no evidence that Ortego and/or Roberts Markel aimed any debt collection activity at Peters or otherwise exposed him to debt collection by filing a lien on property held in Angela's name, or by sending a copy of the lien document to Angela.  Because Peters fails to identify any provision of the FDCPA that makes Ortego and/or Roberts Markel liable to him for activities concerning the lien, summary judgment is granted in their favor and against Peters with respect to any FDCPA claim based on the lien.

The court is unpersuaded by Peters's argument that, notwithstanding the clear wording of the recorded title document, he and Angela are both owners of the second lot under Texas law. Peters argues that the community property law of Texas gives a spouse standing in Texas courts to maintain a claim relating to property belonging to a spouse.

33

In _Forgetaboutit, Inc. v. Warner_, 2005 WL 3219578 (Tex. App. Dec. 1, 2005), cited by Peters, the Texas Court of Appeals recognized that a wife had standing to sue along with her husband for damages relating to a nonfunctioning "satellite operated charge machine" purchased by an unincorporated business allegedly owned only by her husband. The Texas Court of Appeals reasoned that, because "[i]ncome from the business during the property would be community property," the wife's interest in any community property gave the wife "a justiciable interest in the controversy sufficient to confer standing to sue along with her husband." _Id._ at *3. This case does not establish that Texas law makes Peters an owner of Angela's property.

In the first place, the Texas court was examining whether Charlotte, the wife, had standing for subject matter jurisdiction purposes. _See id._ ("To the extent Forgetaboutit complains of lack of standing, that issue may be raised at any time, because without standing a court lacks subject matter jurisdiction."). By contrast, this court is being asked to consider whether Peters was an owner of Angela's property for substantive purposes. This court undoubtedly has subject matter jurisdiction, regardless of whether Peters succeeds or not on any claim. He asserts sufficient injury for subject matter jurisdiction purposes (e.g., by claiming to have been barred from club facilities). What he does not show is that any alleged

34

injury flowed from a debt collection activity that violated the FDCPA with respect to him, rather than possibly to Angela.

In the second place, the Texas court was not saying that Charlotte was an owner of her husband's business. The court's use of the words "would be community property" suggests that the Texas court was positing the possibility that, if Charlotte and her husband separated or got divorced, Charlotte could claim income from the business earned during the marriage as community property. That is, the Texas court was considering a hypothetical situation, not an existing legal status. This court sees no other reason the Texas court used the words "would be" rather than "is." If indeed the concept of community property applied to income earned during the marriage without regard to any separation or divorce, why did the Texas court speak of what "would be"?

Moreover, while the Texas court said that Charlotte's interest in avoiding a diminution in income that might be divided between separating or divorcing spouses gave her standing to sue, it nowhere said that Texas law made her an actual owner of her husband's business. Had Texas law so provided, the Texas court would have had no need to refer to the "income" from the business that "would be" constituting community property. The Texas court could instead have referred to the very business itself. Thus, the distinction the Texas court made between the business and the

35

income from the business undercuts Peters's argument that the Forgetaboutit decision makes him an owner of Angela's property.

Finally, neither that case nor any other case cited by any party indicates that one spouse may assert an FDCPA claim just because another spouse owns property that is the subject of debt collection activities.  No party cites any law suggesting that community property laws in any jurisdiction render any debt collection activity against one spouse actionable by the other spouse.

In enacting the FDCPA, Congress decided who could sue for violations of its provisions.  Congress sought to protect debtors from certain debt collection practices, not to create claims by the debtors' relatives who sought to insert themselves into a debtor-creditor relationship.  Peters cites no authority for the proposition that a debtor's spouse who is not the subject of debt collection activity (and who may not have been exposed to any such activity at all) automatically stands in the shoes of the debtor for FDCPA purposes solely because a state has community property laws.  See generally Burdett v. Harrah's Kansas Casino Corp., 294 F. Supp. 2d 1215, 1227 (D. Kan. 2003) ("Unless plaintiff has a legal status which entitles her to stand in his shoes, she ordinarily does not have standing to assert a FDCPA violation based on collection efforts aimed at her spouse."); Dewey v. Assoc. Collectors, Inc., 927 F. Supp. 1172,

1174 (W.D. Wis. 1996) (refusing to allow wife to maintain an FDCPA claim based on a collection letter sent to husband, and rejecting claim that, because debts are marital debts, a debt collection letter addressed to one spouse should be treated as a letter addressed to both spouses).

> **f.    The Only Potentially Viable FDCPA Claim
> Arises Out of a Letter of May 12, 2011,
> and Any Such Claim May Be Asserted Only
> Against Roberts Markel.**

The only possible factual basis for Peters to recover under the FDCPA may be a letter of May 12, 2011, in which Marc Markel, on Roberts Markel stationery, sent a "Final Demand Letter" to Peters and Angela.  See ECF No. 83-27.  This letter noted that the law firm had been retained by the Bentwater Property Owners Association, Inc., to collect delinquent assessments regarding 254 Creekwood West, Angela's property.  Id. The letter stated that the law firm represented the association "as a creditor in this matter," that it was "attempting to collect a debt," and that "all information obtained will be used for that purpose."  Id.  The letter stated that, "You have previously been sent correspondence with regard to delinquent assessments" and noted that the balance due on the account was "$11,535.98.  Id.

Although the context of that letter may be sufficiently clear for a jury to ultimately conclude that Markel was not attempting to collect a debt from Peters, there is, on the

37

present record, a question of fact to that issue.  Arguably, that letter was an attempt to collect the debt from Peters.  Of the Defendants named in this action, only Roberts Markel could possibly have any FDCPA liability arising from this letter, as it is the only party that may have been acting as a debt collector in connection with the letter.  See Fox v. Citicorp Credit Servs., Inc., 15 F.3d 1507, 1513 (9th Cir. 1994) ("Attorneys, like all other persons, are subject to the definition of 'debt collector' in 15 U.S.C. § 1692a(6)."). Accordingly, Peters's FDCPA claim(s) arising out of the May 12, 2011, letter survive the present motions with respect to Defendant Robert Markel only.

The denial of summary judgment with respect to the May 2011 letter does not mean that the court will ultimately go to trial based on that letter.  There may be evidence that is not yet in the record that demonstrates that the letter was not an attempt to collect a debt from Peters, especially given the lack of clarity concerning Peters's claim.  If such evidence exists, it may or may not support a future motion.

The court notes that it is being asked to transfer this action to the United States District Court for the Southern District of Texas.  As discussed in more detail below, knowing the legal and factual bases of Peters's claims will greatly aid this court in determining whether a transfer of any part of this case is appropriate.  Accordingly, the court directs Peters to

file, no later than June 1, 2012, a statement as to the exact
section or sections of the FDCPA that were allegedly violated by
the law firm of Roberts Markel in sending the letter of May 12,
2011, along with a short explanation of how each cited section of
the FDCPA was violated.

**B.    The Court Continues the Remainder of the Motions.**

Defendants have moved, in part, to dismiss or transfer
this action under 28 U.S.C. § 1404(a) to the Fifth Circuit Court
in Houston, Texas.  At the hearing, Defendants indicated that
they were actually seeking to transfer this matter to the United
States District Court for the Southern District of Texas, Houston
Division.

A request for transfer of venue is governed by 28
U.S.C. § 1404(a), which provides: "For the convenience of parties
and witnesses, in the interest of justice, a district court may
transfer any civil action to any other district or division where
it might have been brought."  The purpose of § 1404(a) is "to
prevent the waste 'of time, energy and money' and 'to protect
litigants, witnesses and the public against unnecessary
inconvenience and expense.'"  <u>Van Dusen v. Barrack</u>, 376 U.S. 612,
616 (1964) (quoting <u>Continental Grain Co. v. Barge FBL-585</u>, 364
U.S. 19, 26-27 (1960)).  Under § 1404(a), the district court has
discretion "to adjudicate motions for transfer according to an
individualized, case-by-case consideration of convenience and

fairness." <u>Jones v. GNC Franchising, Inc.</u>, 211 F.3d 495, 498 (9th Cir. 2000) (citation and internal quotation marks omitted). <u>See</u> <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 27 (1988) (same).  "Weighing of the factors for and against transfer involves subtle considerations and is best left to the discretion of the trial judge." <u>Ventress v. Japan Airlines</u>, 486 F.3d 1111, 1118 (9th Cir. 2007) (quoting <u>Commodity Futures Trading Comm'n v. Savage</u>, 611 F.2d 270, 279 (9th Cir. 1979)).

The Ninth Circuit has stated that a court must weigh multiple factors when considering a motion for change of venue. <u>See</u> <u>Jones</u>, 211 F.3d at 498.  For example, a court may consider:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

<u>Id.</u> at 498-99 (internal footnotes omitted).

The Ninth Circuit has also directed courts to consider private and public interest factors affecting the convenience of a forum. <u>Decker Coal Co. v. Commonwealth Edison Co.</u>, 805 F.2d 834, 843 (9th Cir. 1986) (citing <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 241 (1981)).  Private interest factors include "the

40

'relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).  Public interest factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; . . . and the unfairness of burdening citizens in an unrelated forum with jury duty." Id. (quoting Piper Aircraft, 454 U.S. at 241 n.6).

        Courts have noted that the inconvenience to witnesses is often the most important factor when considering whether a transfer of venue is appropriate.  See Saleh v. Titan Corp., 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005) (quoting State Street Capital Corp. v. Dente, 855 F. Supp. 192, 197 (S.D. Tex. 1994)); see also Ruiz v. Affinity Logistics, 2005 WL 5490240, at *8 (N.D. Cal. Nov 7, 2005).  The convenience of nonparty witnesses is more important than the convenience of party witnesses.  Saleh, 361 F. Supp. 2d at 1160 (quoting Aquatic Amusement Assocs., Ltd. v. Walt Disney World Co., 734 F. Supp. 54, 57 (N.D.N.Y. 1990)).

        Ultimately, the moving party has the burden of showing that the alternative venue is more appropriate.  Ah Sing v.

41

Kimoto, 2012 WL 1366600, *2 (D. Haw. Apr. 18, 2012) (citing

Tamashiro v. Harvey, 487 F. Supp. 2d 1162, 1168 (D. Haw. 2006)).

          To determine whether transfer is appropriate, this

court needs a better understanding than it now has of Peters's

remaining claims.  The court is therefore requesting that the

parties submit supplemental briefing and/or motions concerning

the remaining claims.  In the usual case, this court would not

need such supplemental briefing to get an understanding of a

plaintiff's claims sufficient to support a determination as to

whether a transfer is appropriate.  However, this is not the

usual case.  Instead, it appears to this court that Peters has

attempted to "shoehorn" various claims into legal theories that

may not be an appropriate "fit."  This court is having difficulty

discerning the true nature and viability of the claims and

concludes that it must do so before deciding the transfer issue.

### 1.   First Claim for Relief--FDCPA.

          Given the court's rulings in the earlier portions of

this order, the only FDCPA claim remaining concerns a letter of

May 12, 2011, from the law firm of Roberts Markel to Peters and

Angela.  This remaining claim may proceed against the law firm.

Uncertain which provisions of the FDCPA Peters believes were

violated by this letter and why, this court has earlier in this

order directed Peters to clarify this matter no later than

Friday, June 1, 2012.  See Local Rule 7.6 ("Citations shall be

made to the applicable United States Code provision(s), rather than only to the section(s) of a named act or code, although reference may be made to both.").

The identification of the subsections of the FDCPA at issue will allow this court to better determine whether any part of this action should ultimately be transferred to Texas.  If the court continues to have before it any FDCPA claim, the court will keep that claim here, recognizing that Congress did not intend in passing the FDCPA to burden claimants with farflung litigation. See Maloon v. Schwartz, Zweben & Sling-Baum, L.L.P., 399 F. Supp. 2d 1108, 1114 (D. Haw. 2005).  The court may then be reluctant to split this case into two by transferring other claims.

The court recognizes that the clarification that Peters is being directed to file may give rise to the law firm's conclusion that it should redirect its efforts.  For that reason, the court will permit the law firm to file another dispositive motion concerning the remaining FDCPA claim, if applicable.  Any such motion must be filed no later than July 23, 2012, if intended to affect this court's transfer decision.  Any such motion filed by July 23, 2012, will be heard by this judge at 11:15 a.m. on August 27, 2012.

## 2. Second and Fifth Claims for Relief--Theft and Breach of Contract.

Peters alleges that Bentwater Yacht and Country Club contracted with him to provide him club services in return for

the membership dues he paid on the property held in his name alone.  Peters says that, in attempting to collect the social dues allegedly owed by Angela on her individual property, Bentwater Yacht and Country Club barred Angela and her family from using club facilities, thereby breaching its contract to provide Peters with services in connection with his own lot.  See Complaint, Fifth Claim for Relief.  According to Peters, Bentwater Yacht and Country Club also stole his money by continuing to automatically debit the Florida checking account for membership dues relating to Peters's individual property while barring him from using the club's facilities because fees relating to Angela's lot were unpaid.  See Complaint, Second Claim for Relief.

Although the factual allegations of the Complaint appear to limit these claims to Bentwater Yacht and Country Club, the Complaint also appears to assert all claims against all Defendants.  No later than Friday, June 1, 2012, Peters must state whether the breach of contract and theft claims are asserted against only Bentwater Yacht and Country Club.  The statement on this subject may be included in the same document that Peters has been directed to file with respect to the remaining FDCPA claim.  This information will likely affect this court's determination as to whether a transfer of any part of this case is appropriate.

### 3.  Fourth Claim For Relief--Wrongful Lien Under State Law.

Because the court has granted summary judgment on the wrongful lien claim asserted by Peters under the FDCPA, the Fourth Claim for Relief is limited to state law bases concerning the filing of a wrongful lien by "defendants."  These state law wrongful lien claims are possibly asserted against Ortego and Roberts Markel only, but the court would find it helpful in making its transfer decision if Peters provided clarification on this point.  Peters is therefore directed to file such clarification no later than Friday, June 1, 2012.  The clarification as to which parties are being sued in the state law wrongful lien claim may be included in the document concerning the remaining FDCPA claim and the theft and breach of contract claims.  Peters's briefing of all issues with respect to which the court has set a deadline of June 1, 2012, may not exceed 2,500 words.

No later than Monday, August 6, 2012, all parties may submit supplemental briefing as to whether Peters has standing to assert the wrongful lien claims under Texas law based on the lien placed on Angela's property.  No party's brief on this issue may exceed 2,500 words.  This supplemental briefing should include a discussion of Peters's argument that, because Texas is a community property state, any lien on his wife's property is also

45

a lien on his property.  The parties may want to consult with Texas lawyers versed in that state's community property law.

**IV.          CONCLUSION.**

For the foregoing reasons, the court grants summary judgment with respect to all but one of Peters's FDCPA claims. The court denies summary judgment with respect to the FDCPA claim against Roberts Markel arising out of the May 12, 2011, letter from that law firm to Peters and Angela.  The court also overrules Defendants' Objections at ECF Nos. 122, and 123.

The court orders additional statements and requests and allows supplemental briefing, discovery, and motions as set forth above.  Finally, the court continues the remaining portions of the motions currently before this court until August 27, 2012, at 11:15.

IT IS SO ORDERED.

DATED: Honolulu, June 13, 2012.



/s/ Susan Oki Mollway

Susan Oki Mollway
Chief United States District
Judge

Peters v. Rovberts Markel, PC, et al., Civ. No. 11-00331 SOM/KSC; AMENDED ORDER GRANTING IN PART, DENYING IN PART, AND CONTINUING IN PART MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO DISMISS OR TRANSFER VENUE